UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRIVATE FINANCING ALTERNATIVES, LLC,

Plaintiff,

v.

WALLOON LAKE HOLDINGS, LLC, et al.,

Defendants.

Case No. 1:25-cv-165

Hon. Hala Y. Jarbou

**OPINION**

Plaintiff Private Financing Alternatives, LLC, brings this action to recover on a $10 million loan to Defendant Walloon Lake Holdings, LLC, under a promissory note executed on September 29, 2023. Defendants Matthew Borisch, Jonathan Borisch, Mary Borisch, and the Matthew Allen Borisch Trust agreed to guarantee repayment of the loan. Defendants JLB Restaurant Holdings, LLC, and Hotel Walloon, LLC, are tenants on properties owned or controlled by Walloon Lake Holdings. Before the Court are Defendants' motion for summary judgment (ECF No. 166) and Private Financing's motion for partial summary judgment (ECF No. 169). For the reasons herein, the Court will deny Defendants' motion and grant Private Financing's motion.

**I. BACKGROUND**

In September 2023, Matthew Borisch sought a $15 million "bridge loan" for one of his businesses that needed "liquidity." (M. Borisch Dep. 57, ECF No. 170-3.) Borisch was introduced to Joshua Horrocks, Private Financing's representative, for this purpose. (*See* 9/5/2023 Email, ECF No. 170-1.) On September 15, Borisch completed an "Application for a Mortgage Loan Commitment" in the amount of $15 million. (Mortgage Application, ECF No. 113-9.) On September 28, Private Financing executed a "Mortgage Loan Commitment" for a twelve-month

loan of $15 million at an interest rate of 22%. (Mortgage Loan Commitment, ECF No. 113-1.) Jonathan Borisch, the managing member of Walloon Lake Holdings, signed the commitment on behalf of Walloon Lake Holdings. (*Id.*, PageID.2840.) The commitment letter identified 15 parcels located in Charlevoix County, Michigan, as "collateral" for the loan, including properties described therein as the Barrel Back Restaurant and marina, the Walloon Lake Inn and restaurant, an event space, an industrial building, a retail space, Hotel Walloon, several parcels of land owned by Walloon Lake Holdings, and two lakefront homes in Boyne City, Michigan. (Collateral Schedule, ECF No. 113-1, PageID.2841.) The schedule also included two homes in Naples, Florida. (*Id.*)

On September 29, Walloon Lake Holdings signed a note to borrow $10 million (the "Note"); the Note required monthly payments to Private Financing beginning in September 2023 through August 2024, and a single "balloon payment" for the remaining balance of the loan, with interest, due on September 29, 2024. (Note, ECF No. 1-2, PageID.25–26.) On the same day that Private Financing and Walloon Lake Holdings entered the Note, Private Financing issued a $2 million loan to Mary and Jonathan Borisch (*see* Note 2, ECF No. 18-2, PageID.326) and a $3 million loan to the Trust (*see* Note 3, ECF No. 18-2, PageID.334).

To secure repayment of the Note, Walloon Lake Holdings signed a "Mortgage" that listed 13 of the 15 properties in Charlevoix County as collateral (i.e., the 15 properties in the mortgage commitment, excluding the two homes in Boyne City). (Mortgage, ECF No. 1-3; Ex. A to Mortgage, ECF No. 1-3, PageID.54–59.) Private Financing acknowledges that the smaller loans were secured, in part, by at least four single-family residences: the two houses in Naples, Florida, and the two cottage homes in Boyne City, Michigan. (*See* ECF No. 18-6, PageID.438; ECF No. 18-7, PageID.464.) In addition, Jonathan Borisch, Matthew Borisch, Mary Borisch, and the

Trust signed agreements personally guaranteeing repayment of the $10 million Note. (Trust Guaranty, ECF No. 1-5; Matthew Borisch Guaranty, ECF No. 1-6; J. Borisch Guaranty, ECF No. 1-7; Mary Borisch Guaranty, ECF No. 1-8.)

The parties also signed a cross-collateralization agreement whereby a default under any of the notes would constitute a default under all the others, and real property encumbered by any of the loans could be used to secure any of the other loans.[1] (Cross-Collateralization Agreement, ECF No. 113-5, PageID.2859.)

After making multiple payments totaling approximately $8.5 million (*see* Payment Activity Spreadsheet, ECF No. 167-10), Defendants defaulted on their payment obligations. Private Financing brought this action to recover unpaid principal and interest due under the Note. Defendants seek summary judgment by relying on their defense that the Note is unenforceable. Private Financing seeks partial summary judgment on the same issue.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*,

[1] The Cross-Collateralization Agreement lists a total of five loans (Cross-Collateralization Agreement, PageID.2858–59), but Private Financing advanced funds on only the three loans discussed that total $15 million. (J. Borisch Email, ECF No. 113-3, PageID.2847.)

999 F.3d 400, 410 (6th Cir. 2021). "This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021). "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

## III. ANALYSIS

Defendants argue that the Note is not enforceable because it charges a usurious rate of interest. As the Court discussed in a prior opinion, Michigan's criminal usury statute permits a maximum interest rate of 25% per year, unless an exception applies. *See* Mich. Comp. Laws § 438.41 (making it unlawful to "knowingly charge[], take[], or receive[] any money or other property as interest on the loan . . . at a rate exceeding 25% at simple interest per annum or the equivalent rate for a longer or shorter period"). Here, the Note charges a rate of 22% per year, but that rate increases by 10% upon default, which would result in a rate of 32%. (Note, PageID.26.) Consequently, this Court concluded that "on its face," the Note is usurious. (3/6/2026 Op. 4, ECF No. 151.)

Michigan courts have indicated that unlawfully charging a rate of interest higher than 25% can trigger the wrongful conduct rule. *See Scalici v. Bank One, NA*, No. 254632, 2005 WL 2291732, at *3–4 (Mich. Ct. App. Sept. 20, 2005). Under that rule, "[a] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Orzel v. Scott Drug Co.*, 537 N.W.2d 208, 212 (Mich. 1995).

Private Financing relies on an exception to the 25% usury rate whereby a lender can charge "any rate of interest" under "a note . . . of $100,000.00 or more" if "the bona fide primary

security . . . is a lien against real property other than a single family residence." Mich. Comp. Laws § 438.31c(11). The parties disagree on whether Private Financing has shown that the bona fide primary security for the Note was a lien against real property other than a single-family residence.

As this Court explained previously:

> The Michigan Court of Appeals has interpreted the phrase "primary security" in the usury statute on several occasions. In *Macklin v. Brown*, 314 N.W.2d 538 (Mich. Ct. App. 1981), the court examined Mich. Comp. Laws § 438.31c(2), which provides that parties to a note can agree in writing to any rate of interest where "the bona fide primary security" for the loan "is a first lien against real property." *Id.* The court held that the phrase "primary security" refers to "security which the creditor would sell first and to which he would look to obtain the greatest yield to pay the indebtedness due." *Macklin*, 314 N.W.2d at 540. "'Primary' is defined as 'First in order of time, or development, or in intention.'" *Id.* (quoting Black's Law Dictionary (4th ed)).
>
> In *Macklin*, the debtors purchased a business, a building, and its fixtures for $110,000, using a loan for $82,500. *Id.* at 539. The building and fixtures (i.e., the real property) were worth only $47,500 at the time of sale, less than 50% of the overall sale price, so the defendants argued that the interest rate was usurious and that the exception in § 438.31c(2) did not apply because the real property was not the primary security for the debt. The court disagreed because "the sale price of the business was irrelevant"; the building and fixtures were the primary security for the $82,500 debt. *Id.*
>
> In *Mac Leod v. Bay Haven Marina, Inc.*, No. 187688, 1997 WL 33347816 (Mich. Ct. App. June 13, 1997), the Michigan Court of Appeals applied *Macklin*'s definition of "primary security" to § 438.31c(11), the usury exception at issue here. The plaintiffs in *Mac Leod* had obtained a loan from a bank to purchase a boat from the defendant. When the plaintiffs defaulted on that loan, they made an agreement with the defendant whereby the defendant would pay off the plaintiffs' debt to the bank. *Mac Leod*, 1997 WL 33347816, at *1. In exchange, the plaintiffs gave the defendant title to the boat and a mortgage on two parcels of real estate. *Id.* The defendant paid the bank $110,000 and sold the boat for $70,000, leaving a deficiency that the plaintiffs owed the defendant. The plaintiffs contended that their agreement with the defendant charged a usurious rate of interest and that § 438.31c(11) did not apply because the boat was the primary security for their debt to the defendant rather than the real estate. The court disagreed, concluding that while the boat reduced the plaintiffs' initial indebtedness, it did not act as the primary security because it did not ensure recovery in the event that the plaintiffs defaulted on their debt. *Mac Leod*, 1997 WL 33347816, at *2.

(11/26/2025 Op. 5–6, ECF No. 110.)

In addition, this Court reasoned that the word "primary" "implies that a single-family residence can be part of the secured real estate, so long as it is not the 'primary' security." (*Id.* at 4.) Primary does not mean exclusive. In other words, if real property other than a single-family residence is the first security the creditor would sell in order to obtain the highest yield, then § 438.31c(11) would still apply; it would not matter whether a single-family residence is also part of the security for the debt.

Here, the undisputed evidence indicates that the bona fide primary security for the Note was commercial and undeveloped real property, not a single-family residence. Attached to the Mortgage is a list of properties that secure the $10 million loan. (Ex. A to Mortgage, ECF No. 1-3, PageID.54–59.) Those properties are identified therein according to their addresses and legal descriptions, and the attachment assigns them numbers ranging from 6 to 18. (*Id.*)

Property 6 is 4178 West Street, Walloon Lake, Michigan. (*Id.*, PageID.54.) On the date the loan closed, that property was the Walloon Lake Inn. (J. Borisch Dep. 152, ECF No. 170-2.) It was not a residence. (*Id.*)

Property 7 is located at "M75, Walloon Lake, [Michigan]." (Ex. A. to Mortgage, PageID.54.) It is a parking lot. (*See* M. Borisch Dep. 217, ECF No. 170-3.)

Property 8 is "4045 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.55.) On the date of closing, it was commercial waterfront property, not a single-family residence. (J. Borisch Dep. 155–56.)

Property 9 is "4069 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.55.) This property is the Barrel Back Restaurant and Tommy's Marina, not a single-family residence. (J. Borisch Dep. 150.)

Property 10 is "4127 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.56.) On the date of closing, it was a hotel, not a single-family residence. (J. Borisch Dep. 151.)

Property 11 is "4078 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.56.) It is an event space, not a residence. (J. Borisch Dep. 151–52.)

Property 12 is "4040 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.57.) An industrial building sits on that site. (J. Borisch Dep. 153–54.) On the closing date, it was not a residence. (*Id.* at 154.)

Properties 13 and 14 are listed together as being located at "M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.57.) They contain a parking lot, not a residence. (*See* Appraisal, ECF No. 53-4, PageID.1964–2108.)

Property 15 is "4120 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.57.) On the date of closing, it was an antique store, not a single-family residence. (J. Borisch Dep. 156–57.)

Property 16 is "4036 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.58.) On the closing date, that property contained the foundation and framing for what would become a multi-unit condominium building and general store called the Renwick. (J. Borisch Dep. 157; M. Borisch Dep. 130, 134, ECF No. 180-4.) It was not a single-family residence.

Property 17 is "4008 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.58.) It contains a structure called the "Snake Pit" and industrial buildings used for cold storage businesses, not a residence. (J. Borisch Dep. 84–85, 159–60; M. Borisch Dep. 161–62.)

Property 18 is "4048 M75, Walloon Lake, [Michigan]." (Ex. A to Mortgage, PageID.59.) At closing, it was the foundation for a store, not a residence. (J. Borisch Dep. 160–61.)

Horrocks testified that when he examined the properties that would serve as collateral for the $10 million loan, the hotel was the "primary focus" because "it seemed like it was probably the largest asset." (Horrocks Dep. 151, ECF No. 170-5.) In addition, he focused on "the two operating restaurants." (*Id.*) Similarly, when testifying as Private Financing's representative, Horrocks identified the "income-producing properties" as the primary collateral because the sort of property that Private Financing is "involved with outside [its] lending operations is the ownership and operation of commercial, income-producing properties." (Horrocks 30(b)(6) Dep. 71, ECF No. 170-6.) In other words, he considered the primary collateral to be "the hotel, the two restaurants and marina, the [event center], and the 200 linear feet of vacant land on the lake that's used as an amenity to the hotel." (*Id.*) As part of his evaluation, he personally toured the hotel, the marina, the marina store, and a general store, and he had lunch at the Barrel Back restaurant. (*Id.* at 79–82.) He also stayed at the hotel and looked at its website. (*Id.* at 80.) In his estimate—which was based on his experience, financial statements provided by Defendants for the hotel and restaurants, the income generated by the commercial properties, and appraisals of the commercial properties that he examined before the closing—those properties were worth more than $20 million and were thus sufficient to secure the $10 million Note. (*Id.* at 73–74.) Similarly, in September 2024, Jonathan Borisch told Private Financing that he believed the commercial properties were worth "between $17mm and $20mm." (J. Borisch Email, ECF No. 182-3, PageID.4902.) Defendants offer no evidence to the contrary.

To be sure, on one of the properties securing the Note sits the Renwick, which is a commercial building that contains a store and condominiums, but that was not its state at the time of closing, and there is no indication that either party to the Note or Mortgage intended that the individual condominium units would become subject to a lien. *See Tierney v. Collen*, 261 N.W.

298, 300 (Mich. 1935) ("[T]he question whether a contract is usurious or not must be decided with reference to the time when it was entered into." (citation omitted)). Though Matthew Borisch told some of Private Financing's representatives about the planned Renwick building and took them through the Renwick construction before the closing date (M. Borisch Dep. 119–33, ECF No. 180-4), the units were not completed until after the closing date. Borisch said he "only took them into the building" to see an unfinished condominium unit he had reserved for himself because the building "was a really cool project that we were working on, and the view from the condo [he] had saved for [himself] was incredible." (*Id.* at 131.) He wanted to "prove [the project's] value." (*Id.*)

Also, before the loan closed, Jonathan and Matthew Borisch expressly represented to Private Financing that the loan was intended as a "bridge for working capital" (Application for Mortgage Loan Commitment, PageID.2897) that would be used "to pay down the existing credit line with M/T Bank and as operating capital" (Mortgage Loan Commitment, PageID.2837). They did not indicate that any funds from the loan would be used to build the Renwick. In fact, though Walloon Lake Holdings signed the Note and owned the properties that secured the Mortgage, Matthew Borisch received all the funds as a "loan" from his father, Jonathan. (J. Borisch Dep. 181–82.) Matthew Borisch does not have an ownership interest in Walloon Lake Holdings. (M. Borisch Dep. 133.) It is his father's business. (*Id.*)

And unbeknownst to Private Financing, Jonathan Borisch had the parcels on which the Renwick was built renumbered and combined into new parcels (J. Borisch Dep. 247), ostensibly for the purpose of accommodating the building and parking lot. He did not tell Private Financing that he had done so. (*Id.* at 247, 250.) Later, when he tried to sell some condominium units, he was surprised to learn that Private Financing's mortgage had attached to them. (*Id.* at 245.)

At any rate, a building with a store and multiple dwellings is plainly not a single-family residence. And even if the individual condominium units could be considered single-family residences, they cannot be the bona fide primary security for the Note because they did not exist as such when the parties entered the loan transaction. Also, nothing in the parties' agreements or anywhere else in the record suggests that Defendants requested, and Private Financing issued, Walloon Lake Holdings the $10 million loan so that Defendants could build and sell condominium units, or that the individual condominiums themselves (as opposed to the entire Renwick building) would be encumbered by the loan. There is no mention of that development or those condominium units in any of the agreements related to the loan; they are conspicuously absent from those documents. Accordingly, none of the properties that served as the bona fide security for the Note were single-family residences.

That said, the single-family homes that secured the smaller loans also became collateral for the Note under the Cross-Collateralization Agreement. But at most, that agreement suggests that these homes functioned as *secondary* security for the Note, not the primary security. The homes were not listed in the Note or Mortgage pertaining to the $10 million loan. Also, Horrocks testified that Private Financing took a lien on the homes out of "an abundance of caution." (Horrocks 30(b)(6) Dep. 74.) He told others the same thing in an email shortly before closing on the loan. (9/27/2023 Horrocks Email, ECF No. 109-1, PageID.2762.) He explained at his deposition that when Private Financing receives a request for "quick" funding, Private Financing typically "take[s] [a security interest in] everything that [the borrower has] available" because that speeds up the process by "prevent[ing] [Private Financing] from having to do real in-depth valuations of the properties." (Horrocks Dep. 74.) This characterization of the lien on the homes is consistent with his estimate of the value of the commercial properties securing the Note, which is much higher

than the $10 million loan. It is also consistent with the parties' agreements, which specifically tie the properties owned by Walloon Lake Holdings to the $10 million Note and the homes to the smaller loans. Thus, even when accounting for the four single-family homes that were part of the collateral through the Cross-Collateralization Agreement, the primary bona fide security for the $10 million loan was real property that was not a single-family residence.

Defendants rely on the face of the Note to argue that the primary security for the $10 million loan consisted of personal guarantees from the Trust and the Borisches. The Note states that the $10 million loan "is secured by separate security instruments prepared together with this Note as follows:" and then it lists personal guarantees signed by the Trust and the Borisches, as well as a "UCC Financing Statement" on "all assets of Walloon Lake Holdings, LLC"; it does not list the Mortgage. (Note, PageID.27.) But that list is not exclusive, and it does not nullify the Mortgage, which is a separate agreement securing a lien on real property. Also, that language in the Note says nothing about whether the personal guarantees are the "primary" security, i.e., the security that a creditor would sell first in order to recover the debt. Unlike with the real property, there is no evidence of the value of those guarantees (or of the personal property of Walloon Lake Holdings secured by the UCC financing statement). Nor is there any evidence that Private Financing considered the value of those guarantees or personal property when issuing the loan. Indeed, a personal guaranty is simply another form of contract like the Note itself; a guaranty does not offer a lender the same legal remedies or level of protection as a secured interest in property. It requires judicial enforcement, it does not permit non-judicial foreclosure, and it does not take precedence over a secured interest. Thus, it is an inherently secondary form of security when compared to a lien on real estate.

Defendants argue that the face of the note is dispositive, citing *Paul v. U.S. Mutual Financial Corp.*, 389 N.W.2d 487 (Mich. Ct. App. 1986). There, the Michigan Court of Appeals concluded that the usury exception in § 438.31c(11) did not apply because "the promissory note explicitly states that it is secured by a security agreement covering personal property. Therefore, the personal property would be the primary security for the note." *Id.* at 493. But that court also noted that "nothing in the promissory note gives the holder of the note the right to look to the real estate for satisfaction upon default of the promissory note." *Id.* And it appears that no other agreement gave that right to the lender; instead, the lender argued that the promissory note itself "secured" the majority of the "total purchase price of the business." *Id.* The court rejected *that argument* by looking at the terms of the note. By contrast, the parties here signed the Mortgage, which gives Private Financing the right to look to the real estate owned by Walloon Lake Holdings to secure repayment of the Note. Thus, *Paul* is distinguishable.

In short, no evidence suggests that Private Financing relied primarily on the personal guarantees (or personal property of Walloon Lake Holdings) to secure its loan to Walloon Lake Holdings, or that it would look to those guarantees or property first to recoup its loan. The existence of the recorded Mortgage and Cross-Collateralization Agreement, the testimony of Horrocks, Private Financing's evaluation of the income-generating commercial real property before issuing the loan, and the value of that real property, all suggest otherwise.

Defendants argue that Private Financing's argument fails because expert testimony is necessary to determine what an "objectively reasonable commercial lender" would identify as the primary security for the Note. (Defs.' Am. Resp. Br. 23, ECF No. 180.) But Defendants provide

no authority for their objective characterization of what it means for a security to be primary.[2] To the contrary, *Macklin* suggests that primary can mean first "in order of . . . intention," i.e., the "security which *the* creditor [to the transaction] would sell first." *Macklin*, 314 N.W.2d at 540 (emphasis added, citation omitted). An expert is not needed to identify that security here. The undisputed facts all point to the parties' understanding and intent that the commercial and undeveloped real estate owned by Walloon Lake Holdings would serve as the primary security for the loan to Walloon Lake Holdings. Moreover, considering the value and nature of the commercial properties, it was reasonable for Private Financing to view them as the primary security. In other words, even when construing the record in Defendants' favor, a reasonable jury would have to conclude that the bona fide primary security for the Note was a lien on real property that was not a single-family residence.

As an alternative argument, Defendants contend that Private Financing engaged in wrongful conduct by applying the loan payments to all three notes and then concocting a scheme to shield the usurious interest rate by claiming to have canceled the smaller loans secured by the single-family residences and not disclosing those loans to the Court when initially filing this action. According to Defendants, Private Financing would have known that those smaller loans were not subject to the usury exception in Mich. Comp. Laws § 438.31c(11) because they were secured by single-family homes. Regardless, Defendants do not explain why it was illegal for Private Financing to allocate the loan payments to all three loans rather than just the $10 million loan. *See Orzel*, 537 N.W.2d at 214 ("To implicate the wrongful-conduct rule, the plaintiff's conduct must

---

[2] Defendants contend that Private Financing admitted that this objective standard applies when Private Financing asked the Court for an extension of the discovery deadline so that it could obtain an expert. However, the Court must apply Michigan law. A party cannot make an admission as to the applicable legal standard.

be prohibited or almost entirely prohibited under a penal or criminal statute.”).[3] Nor do Defendants explain why it was illegal for Private Financing to bring an action that seeks to enforce only the Note. Indeed, the Cross-Collateralization Agreement makes clear that each of the notes is a “separately enforceable” instrument. (Cross-Collateralization Agreement, PageID.2860.) Thus, Defendants’ alternative wrongful-conduct argument is not persuasive.

Finally, Defendants argue that the usury exception does not apply because Private Financing did not possess a valid lien on any of the properties listed in the Mortgage. According to Defendants, the Mortgage does not contain the proper language of conveyance under Michigan law to create a mortgage lien on real property. Defendants rely on Mich. Comp. Laws § 565.164 (2004), which provides as follows:

> A mortgage of lands that is worded in substance as follows: “A.B. mortgages and warrants to C.D., (here describe the premises) to secure the re-payment of” (here describe the indebtedness or obligations the mortgage secures) and is signed by the grantor, is a valid and enforceable mortgage to the grantee and the grantee’s heirs, assigns, successors, and personal representatives with warranty from the grantor and the grantor’s legal representatives, of marketable title in the grantor, free from prior incumbrances. If the indebtedness or obligations secured are described generally, such as “all indebtedness that A.B. now and in the future owes to C.D.”, and if the words “and warrant” are omitted from the form, the mortgage is valid and enforceable, but without warranty.

*Id.* Defendants argue that the Mortgage is deficient because it lacks a statement affirmatively granting a mortgage to Private Financing covering the commercial properties. The Court disagrees.

By its terms, the foregoing statute specifies the “substance” of what constitutes a valid mortgage, not the precise form. *See In re Boyd*, 185 B.R. 529, 531 (Bankr. E.D. Mich. 1995)

[3] If Private Financing improperly allocated payments under the loan agreements, that conduct might change what Defendants owe under the Note, but it would not bar enforcement of the Note altogether.

(reviewing a similarly-worded, earlier version of the statute).[4] Here, the body of the Mortgage refers to itself as a "Mortgage." (Mortgage, PageID.34.) It then defines "Mortgage" as "any and all *mortgages granted by Borrower to Lender* whether now or hereafter existing, *including*, without limitation, *the mortgage of even date herewith securing Lender's interest in the Real Property*." (*Id.*, PageID.50 (emphasis added).) The agreement defines "Real Property" as the real property identified in the attached exhibit, which lists the commercial and undeveloped properties the Court discussed above. (*See id.*) And the Mortgage specifies that the debt at issue is the $10 million loan issued under the Note. (*Id.*, PageID.34, 50.) This language was sufficient to convey a mortgage on those properties to Private Financing. It clearly states that Walloon Lake Holdings was granting Private Financing a mortgage on the properties listed in the exhibit in order to secure repayment of the Note,[5] which is all that the statute requires.

Defendants cite *J.S. Evangelista Development, LLC v. Foundation Capital Resources, Inc.*, No. 311563, 2014 WL 1679067 (Mich. Ct. App. Apr. 24, 2014), in which the Michigan Court of Appeals held that a mortgage complied with § 565.164 because it stated that the borrower "does hereby mortgage, sell, bargain, grant, pledge, warrant, convey and assign" the borrower's interest in real property as consideration for a loan. *Id.* at *3. That opinion does not conflict with this one. It does not hold that the phrase "[borrower] does hereby mortgage [the property]" is *necessary* for a valid mortgage. Thus, it does not indicate that the language in the Mortgage is insufficient.

---

[4] Defendants cite legislative history for their argument that the statute requires strict adherence to its form, but even that history states that the statute provides that a mortgage is valid "if it is worded *substantially* as required." (House Fiscal Agency, Legislative Analysis (May 5, 2004), ECF No. 167-16, PageID.4287 (emphasis added).)

[5] Similarly, in the Cross-Collateralization Agreement, Defendants expressly acknowledged that the $10 million loan to Walloon Lake Holdings was "secured by a Mortgage . . . encumbering real property owned by Walloon Lake Holdings, LLC, particularly described in Exhibit 'A' attached hereto." (Cross-Collateralization Agreement, PageID.2858.) The exhibit attached to that agreement lists the same properties as the exhibit attached to the Mortgage. (Ex. A to Cross-Collateralization Agreement, ECF No. 113-5, PageID.2863–67.)

Defendants also focus on the Mortgage's statement that the following documents "shall evidence and/or secure the Loan evidenced by the Note: (1) A COMMERCIAL PROMISSORY NOTE FROM WALLOON LAKE HOLDINGS, (2) A UCC FILING STATEMENT ON ALL ASSETS OF WALLOON LAKE HOLDINGS, LLC, AND (3) GUARANTIES FROM THE ABOVE LISTED GUARANTORS." (Mortgage, PageID.45.) Defendants interpret this provision to mean that the real property did not secure the loan because that property is not mentioned, but that interpretation ignores the language of conveyance discussed above as well as the list of properties attached to the Mortgage. That language and list would be meaningless if the only documents evidencing security for the loan were a UCC filing statement and guarantees. The provision is better understood to refer to *documents other than the Mortgage* that "evidence and/or secure" the $10 million loan because the Mortgage itself evidences and secures the loan. In short, Defendants' arguments against the validity of the mortgage lien are not persuasive.

## IV. CONCLUSION

For the reasons herein, Private Financing is entitled to summary judgment regarding Defendants' wrongful conduct and usury defenses. The Note and accompanying loan documents complied with Michigan usury law because Private Financing was entitled to charge any rate of interest on that loan under Mich. Comp. Laws § 438.31c(11). There is no genuine dispute that the Note was for more than $100,000 and that the bona fide primary security for the Note was a lien on real property that was not a single-family residence. Consequently, Defendants cannot rely on the wrongful-conduct rule to bar enforcement of the Note. The Court will grant Private Financing's motion and deny Defendants' motion.

Dated: September 11, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE